UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

DEWAYNE D. KNIGHT,

                Plaintiff,

    v.                                     Case No. 19-cv-575-pp

SONJA ANDERSON, *et al.*,

                Defendants.

**ORDER DENYING PLAINTIFF'S REQUEST FOR ENTRY OF DIRECT VERDICT (DKT. NO. 30), DENYING PLAINTIFF'S MOTION TO APPOINT COUNSEL (DKT. No. 68), GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT (DKT. NOS. 35, 42) AND DISMISSING CASE**

Plaintiff DeWayne D. Knight, who is in state custody and is representing himself, is proceeding under 42 U.S.C. §1983 on Eighth Amendment claims against a doctor and three nurses who worked at the Wisconsin Secure Program Facility ("WSPF"). The doctor moves for summary judgment, dkt. no. 35, as do the nurses, dkt. no. 42. The plaintiff opposes their motions. The court finds that the defendants are entitled to judgment as a matter of law, grants their motions and dismisses the case.

**I.**    **Facts**

    A.    <u>Procedural Background</u>

The plaintiff filed his complaint on April 22, 2019, alleging that Dr. J. Patterson failed to treat a knee injury he suffered in September 2018 while playing basketball. Dkt. No. 1. The court screened the complaint and concluded that it failed to state a claim against Patterson. Dkt. No. 15 at 7. But

the court noted that the plaintiff had identified four nurses who may have been liable for failing to arrange for treatment of his knee injury. Id. at 7–8. The court gave the plaintiff an opportunity to file an amended complaint naming "as defendants those people whom he believes were directly responsible for the delays in failing to address his pain." Id. at 8.

One week later, the court received from the plaintiff an amended complaint. Dkt. No. 16. The court screened the amended complaint and allowed the plaintiff to proceed on Eighth Amendment claims of deliberate indifference against Dr. Patterson and Nurses Sonya Anderson, Amanda Drone, Honly and Kremerling. Dkt. No. 17 at 8–9. The Wisconsin Department of Justice appeared for Anderson, Drone and Michael Kemerling (the proper name for "Nurse Kremerling," as the plaintiff had identified him). Dkt. No. 20. The DOJ did not accept service on behalf of Patterson (identified as James Patterson) because he works for an independent agency and not the State of Wisconsin. Id. The DOJ also did not accept service on behalf of Nurse Honly, noting that it could not locate a person with that name. Id. The court ordered the U.S. Marshal to serve Patterson, dkt. no. 23, and independent counsel appeared on his behalf, dkt. no. 24.

On February 3, 2021, the court entered a scheduling order setting deadlines for discovery and dispositive motions. Dkt. No. 28. The court noted that the DOJ had not been able to identify the defendant that the amended complaint identified as "Nurse Honly." Id. at 2. The court ordered the plaintiff to use discovery to identify that defendant's proper name within seventy-five

days (by April 19, 2021). Id. The April 19, 2021 deadline passed without the plaintiff having identified the proper name for Nurse Honly. The court dismissed Nurse Honly because the plaintiff had failed to diligently pursue his claim against him or her. Dkt. No. 29. On August 2, 2019, the remaining defendants moved for summary judgment on all claims. Dkt. Nos. 35, 42.

B.    Plaintiff's Letter

On July 1, 2021, the court received from the plaintiff a letter requesting entry of a "direct" verdict under Federal Rule of Civil Procedure 50(a)(1). Dkt. No. 30. The plaintiff observed that the court had set a strict August 2, 2021 deadline by which the parties must file motions for summary judgment. Id. at 1. He asserted that because the defendants had yet to move for summary judgment, "it would be impossible for the defendants to meet the August 2, 2021 deadline seeing that the plaintiff has (30) days to respond." Id. He argued that it "appear[ed] to be clear that the defendants [didn't] intend to" dispute the plaintiff's claims. Id. at 1–2. He asked that instead of scheduling a trial, the court direct a verdict on his behalf and grant him the damages he seeks. Id. at 2.

The court will deny the plaintiff's request. The scheduling order states that "[p]arties may file motions for summary judgment on the merits . . . no later than August 2, 2021." Dkt. No. 28 at 2 (, bolding omitted). The scheduling order also stated that "[a] party opposing a motion for summary judgment must file a response 'within 30 days of service of the motion.'" Id. (emphasis omitted). The order did not require that the *response* to a motion for summary judgment

had to be filed by the August 2, 2021 deadline. That was the deadline for filing the *initial motions* for summary judgment themselves. The defendants met that deadline when they filed their motions for summary judgment on the August 2, 2021 deadline.

Even if the defendants had not filed motions for summary judgment, the court still would deny the plaintiff's request for an entry of a directed verdict. Federal Rule of Civil Procedure 50 states that the court may direct a verdict for a party "[i]f a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a)(1). That has not happened here. There has been no jury trial and the defendants contest the plaintiff's claims: The amended complaint *alleges* that certain events occurred and the defendants answered the amended complaint by *denying* those allegations. Dkt. Nos. 22, 27. This order will determine whether there is evidence of a genuine dispute as to a material fact for a jury to decide. For the court to direct a verdict before trial would be premature and inappropriate.

    C.    <u>Plaintiff's Motion for Appointment of Counsel</u>

The plaintiff has filed a motion asking the court to appoint counsel for him. Dkt. No. 68. Because the court is granting the defendants' motions for summary judgment and dismissing this case, the court will deny the motion to appoint counsel as moot.

D.    Factual Background

1.    *The State Defendants*

Nurses Drone, Anderson and Kemerling ("State defendants") were Nurse Clinicians 2 in the Health Services Unit ("HSU") at WSPF in September 2018. Dkt. No. 44 at ¶2. As nurses, the State defendants did not have the authority to prescribe medications, refer patients to off-site specialists, order imaging studies or override treatment decisions of physicians, nurse practitioners or other advanced care providers ("ACPs") in the HSU. Id. at ¶3. They could provide "interventions in accordance with nursing protocols if it [was] medically indicated." Id. at ¶4. For a knee injury, appropriate interventions included heat or ice therapy, over-the-counter medications such as Tylenol or ibuprofen and muscle rub cream. Id. at ¶¶3–4.

The State defendants assert that as nurses, they have no control over an ACP's schedule. Dkt. No. 44 at ¶39. They can refer an incarcerated person to a medical program assistant to place the person on the ACP's schedule. Id. But incarcerated persons may be moved around or off the schedule if an ACP needs to tend to an emergent issue with a patient or if there is an issue on a housing unit, such as a lockdown or security issue. Id. They assert that if an incarcerated person is on an ACP's schedule, then the ACP is aware of the person's request to be seen. Id. at ¶42. According to the State defendants, there is nothing more they as nurses can provide an incarcerated person who already has over-the-counter pain medications. Id. at ¶40; Dkt. No. 46 at ¶12. They each aver that they defer to the judgment of the ACPs in determining a plan for

chronic pain management issues. Dkt. No. 44 at ¶41; Dkt. No 46 at ¶13; Dkt. No. 47 at ¶18; Dkt. No. 48 at ¶24.

2. *Dr. Patterson*

Dr. Patterson was a *locum tenens[1]* physician temporarily assigned to WSPF from March to November 2018. Dkt. No. 37 at ¶7. As a *locum tenens* physician, Patterson did not hold a supervisory role, was not employed by the Wisconsin Department of Corrections or the State of Wisconsin and worked only Monday through Thursday. Id. at ¶¶8–10. He did not work at the prison on weekends and had various other days off for vacation or personal time. Id. at ¶11. When Patterson was not working, WSPF staff did not inform him of the condition or status of any inmate. Id. at ¶12. Patterson avers that he was not a primary care doctor for any incarcerated persons and that incarcerated persons were scheduled to see other medical providers either on- or off-site. Id. at ¶13; Dkt. No. 39 at ¶7. Nor was Patterson responsible for scheduling appointments for incarcerated persons. Dkt. No. 37 at ¶14. He avers that when he was scheduled to work, WSPF staff would provide him a list of individuals to see that day. Id. at ¶15; Dkt. No. 39 at ¶9. If incarcerated persons had emergent needs, or if a lockdown or other circumstance occurred, staff would reschedule the appointments to accommodate those circumstances. Dkt. No. 37 at ¶16; Dkt. No. 39 at ¶10.

The plaintiff disputes Dr. Patterson's statement that he was not the plaintiff's primary care provider. Dkt. No. 54 at ¶13; Dkt. No. 52 at ¶34. In

---

[1] This means he was temporarily working at WSPF.

support he cites Nurses Drone and Andersons's responses to the plaintiff's first request for admissions, in which they admit that Patterson was the plaintiff's primary care doctor at WSPF on September 18, 2018, and October 26, 2018. Dkt. No. 54 at ¶13; Dkt. No. 56 at 31, 38. The plaintiff does not dispute that incarcerated persons may be scheduled to see other onsite or offsite providers. Dkt. No. 54 at ¶13. The plaintiff also objects to several of the defendants' proposed facts that the defendants support by citing only to their declarations. _E.g._ Dkt. No. 54 at ¶¶8–9, 14–16. But a witness's declaration is sufficient evidence to establish a proposed fact, so long as the witness has personal knowledge of that fact. See Fed. R. Civ. P. 56(c)(4); Hill v. Tangherlini, 724 F.3d 965, 967–68 (7th Cir. 2013). The plaintiff cites no evidence in support of his objections, which do not constitute genuine disputes. The court considers these facts undisputed.

### 3. _Medical Care Procedures in the HSU_

When an incarcerated person has a medical concern, wants to communicate with medical staff or requests to be seen for a medical appointment, he fills out a request for health services and submits it to the HSU. Dkt. No. 44 at ¶6. Nursing staff review and answer these requests once each day. Id. All nurses assigned to a shift typically triage and respond to requests, which are split up between the nurses on staff. Id. at ¶7. That means that not every nurse, including each of the State defendants, sees every request an incarcerated person files with the HSU. Id. at ¶8. If an incarcerated person

Case 2:19-cv-00575-PP   Filed 08/08/22   Page 7 of 33   Document 69

has a medical emergency, he must notify security staff on his housing unit. Id. at ¶9. Security staff informs HSU staff of the emergency. Id.

HSU employees provide medical diagnosis, care and treatment of incarcerated persons, whereas offsite specialists provide consultations and recommendations. Id. at ¶¶10–11. Nurses write offsite provider recommendations in a patient's chart and provide the recommendation to an ACP for review. Id. at ¶11. An ACP decides whether to implement the recommendations as ordered, modify the recommendations or order new treatment based on his or her professional judgment and institutional and security concerns. Id. at ¶12. An ACP must sign the orders for treatment before nursing staff can take any action for the patient. Id. Once nursing staff see a patient and issue medical restrictions, the patient is placed on a list to see an ACP. Id. at ¶38. HSU staff will see the same patient again only if he reports a new or worsening injury or symptoms. Id.

4. *Treatment of the Plaintiff's Knee Injury*

The plaintiff was incarcerated at WSPF in September through November 2018. Dkt. No. 37 at ¶1; Dkt. No. 51 at ¶1. The plaintiff has chronic conditions affecting his left knee, including degenerative joint disease and a previous tear in his anterior cruciate ligament ("ACL") that required two surgeries. Dkt. No. 37 at ¶2. The plaintiff also suffers chronic knee pain, which is aggravated by physical activity. Id. at ¶¶3–4. The plaintiff was seen numerous times in 2016 and 2017 for knee pain after he played basketball or participated in other physical activities that increased his pain. Id. at ¶¶4–5; Dkt. No. 44 at ¶13.

8

On Saturday, September 8, 2018, the plaintiff again injured his knee while playing basketball. Dkt. No. 37 at ¶6. He told HSU staff that he "felt and heard a pop" in his left knee. Dkt. No. 44 at ¶14. Because ACPs do not work weekends, the plaintiff saw Nurse Kemerling about his injury. Dkt. No. 37 at ¶17; Dkt. No. 44 at ¶15. Kemerling examined the plaintiff's left leg and contacted the on-call doctor for the day, Dr. Kober (not a defendant). Dkt. No. 37 at ¶17; Dkt. No. 44 at ¶15; Dkt. No. 52 at ¶4. Kober ordered Kemerling to send the plaintiff to the emergency room for evaluation. Dkt. No. 37 at ¶18; Dkt. No. 44 at ¶15. Emergency room doctor Christine Langemo (not a defendant) diagnosed the plaintiff with a knee strain and instructed him to use an "[i]mmobilizer as long as [it] improves discomfort" and to "[l]imit weight bearing as tolerated." Id. at ¶19; Dkt. No. 38-3 at 2–4. Langemo prescribed the plaintiff Tylenol and ibuprofen for his pain. Dkt. No. 37 at ¶20; Dkt. No. 38-3 at 4. Langemo's examination was recorded in an "Off-Site Service Request and Report," where she further recommended that the plaintiff "recheck [with a] nurse Monday." Dkt. No. 37 at ¶21; Dkt. No. 38-1 at 31.

On Sunday, September 9, 2018, after the plaintiff returned to WSPF, he asked to receive his meals in his cell because he was wearing the immobilizer knee brace and using crutches, as Dr. Langemo had recommended. Dkt. No. 37 at ¶22; Dkt. No. 38-4 at 15. The next day, Nurse Anderson responded to the plaintiff's request, noting that she had referred the request to an ACP. Dkt. No. 44 at ¶17; Dkt. No. 38-4 at 15. No HSU staff personally examined the plaintiff this day. Dkt. No. 58 at ¶8. The next day, Dr. Patterson signed off on

Langemo's recommendations and approved the plaintiff's request to eat in his cell for the next five days. Dkt. No. 44 at ¶18; Dkt. No. 45-1 at 37. A medical program assistant (not a defendant) reviewed and implemented those orders the next day, September 12, 2018. Dkt. No. 44 at ¶19.

On September 11, 2018, Dr. Patterson was scheduled to see several incarcerated persons, including the plaintiff. Dkt. No. 37 at ¶24. Patterson avers he "saw as many of the scheduled inmates as time allowed that day, given other circumstances." Id. at ¶25; Dkt. No. 39 at ¶12. Although Patterson does not say what the "other circumstances" were, he avers that they prevented him from seeing the plaintiff on September 11, 2018. Dkt. No. 37 at ¶26; Dkt. No. 39 at ¶13. The plaintiff's medical file includes a September 11, 2018 note from Patterson stating, "Unable to see [due] to other activities." Dkt. No. 38-1 at 18. Patterson extended the plaintiff's feed-in-cell restriction for five days to allow the plaintiff to avoid unnecessary physical activity. Dkt. No. 37 at ¶27; Dkt. No. 38-1 at 23. Although the plaintiff was rescheduled to see Patterson on September 13, 2018, Patterson was unable to see him that day because of "time constraints." Dkt. No. 37 at ¶¶28–29; Dkt. No. 38-1 at 18. Patterson did not work the next day, which was a Friday. Dkt. No. 37 at ¶30.

The plaintiff did not submit any requests for health services complaining about his knee between September 10 and 16, 2018. Id. at ¶31. On September 17, 2018, he submitted his first request since receiving the food-in-cell restriction. Id. at ¶32. That complaint states:

> I went to the hospital Sat 9-9-18 for a[n] injury to my L knee [and] was placed on crutches [and] a knee immobilizer [and] yet NO ONE

> has contacted me to do a follow-up, address my injury or anything.
> Furthermore I wasn't even given any pain meds. Why is this?

Dkt. No. 38-4 at 13 (emphasis in the original). Nurse Drone responded the next day (the same day she received the request) that the plaintiff was "scheduled with the ACP soon." Dkt. No. 37 at ¶38; Dkt. No. 38-4 at 13; Dkt. No. 44 at ¶22. Drone admitted in response to the plaintiff's first request for admission that this response meant the plaintiff was scheduled for an appointment with Dr. Patterson. Dkt. No. 56 at 31. Patterson asserts that the plaintiff's medical records show he was given pain medication September 9 through 11, 2018. Dkt. No. 37 at ¶33 (citing Dkt. No. 38-5 at 2–3). The plaintiff states he was given only liquid Tylenol during those days and was not given stronger pain medication until later that month. Dkt. No. 54 at ¶33. The plaintiff's medical records also show he refused pain medication on September 17 and 23, 2018. Dkt. No. 37 at ¶34; Dkt. No. 38-5 at 2–3.

Dr. Patterson did not work at WSPF from September 18 through 23, 2018. Dkt. No. 37 at ¶35. He did not see patients during those days, and WSPF staff did not update him on patients' status or inform him when an incarcerated person requested an appointment in the HSU. Id. at ¶36. Patterson did not review the plaintiff's September 17, 2018 request before leaving the prison that day. Id. at ¶37.

On September 20, 2018, the plaintiff submitted another request for health services reiterating that he had not received pain medication or seen a nurse or doctor since his hospital visit. Id. at ¶39; Dkt. No. 38-4 at 12. The plaintiff wrote that his pain was "extreme" and "becoming more [and] more

intense." Dkt. No. 38-4 at 12. Nurse Drone reviewed the plaintiff's request two days later, the same day she received it. Dkt. No. 44 at ¶¶23–24. She avers that her normal procedure when an incarcerated person reports chronic pain is to see if the patient has ibuprofen, Tylenol and/or ice and to see if he is on an ACP's schedule. Id. at ¶26; Dkt. No. 46 at ¶10. She checked the plaintiff's records and saw that he had been examined at the hospital, was on an ACP's schedule, had access to Tylenol and ibuprofen and had a knee immobilizer and crutches. Dkt. No. 44 at ¶27; Dkt. No. 46 at ¶11. Drone responded to the plaintiff's request, stating that he was "scheduled very soon with the ACP." Dkt. No. 37 at ¶40; Dkt. No. 38-4 at 12. She forwarded the request to Dr. Patterson, who responded by writing on the plaintiff's request, "will see then." Dkt. No. 38-4 at 12; Dkt. No. 44 at ¶25. According to Drone, this meant Patterson "would address [the plaintiff's] complaints at his upcoming appointment." Dkt. No. 46 at ¶9. Drone did not see the plaintiff in the HSU in response to either his September 17 or 20, 2018 request. Dkt. No. 52 at ¶16.

On September 23, 2018, the plaintiff filed an inmate complaint about his medical treatment since his hospital visit. Dkt. No. 37 at ¶41. The plaintiff reiterated his injury, noted that he was taken to the hospital for x-rays and said that he returned to WSPF "in a [f]ull knee immobilizer [and] [c]rutches." Dkt. No. 38-6 at 9. He alleged that he "wasn't given any instruction accept [sic] to wear the immobilizer [and] stay off [his] L leg until [he] seen W.S.P.F. doctors." Id. He noted that as of September 20, 2018, he had not received results from the x-ray. Id. He said that as of September 23, 2018, he had not

seen a doctor or nurse about his knee injury and "wasn't given any pain medication or anything." Id. The plaintiff asserted that the "delay in treatment is absurd" and said his leg "ha[d] stiffened up from being locked in the same position" in the immobilizer for fifteen days. Id. He asserted that the HSU was ignoring his injury and said he had been "in significant pain for the last 15 days." Id. On September 25, 2018, an inmate complaint examiner recommended affirming the complaint "to acknowledge the delay." Id. at 4. On October 15, 2018, a reviewing authority accepted that recommendation and noted, "Pt. has been rescheduled and will be followed up." Id. at 6.

Dr. Patterson returned to WSPF the next day—September 24, 2018—and evaluated the plaintiff. Dkt. No. 37 at ¶42. He wrote an order to discontinue the plaintiff's ibuprofen, to start Naproxen 500 mg twice per day for inflammation and pain and to schedule the plaintiff for an MRI and for an appointment with orthopedics. Id. at ¶43; Dkt. No. 44 at ¶28; Dkt. No. 45-1 at 37. Patterson also extended the plaintiff's food-in-cell restriction for an additional two weeks to avoid him having to walk on his knee to retrieve his meals. Dkt. No. 37 at ¶44. Nurse Kemerling initialized these orders the same day to acknowledge that he had reviewed and implemented them. Dkt. No. 44 at ¶29. A medical program assistant initialed the orders to schedule the plaintiff for an orthopedics evaluation and an MRI. Id. The plaintiff avers that he told Patterson that the "knee immobilizer was causing [him] pain," but that Patterson left him in the immobilizer. Dkt. No. 52 at ¶30. Patterson's progress notes from the September

24, 2018 visit do not mention the immobilizer or the plaintiff's complaint about it. Dkt. No. 38-1 at 18.

On October 4, 2018, Nurse Waterman (not a defendant) saw the plaintiff. Dkt. No. 37 at ¶45. She noted the plaintiff's injury and medications and wrote "No complaints offered" in his progress notes. Id. at ¶46; Dkt. No. 38-1 at 19, 35. The plaintiff says Waterman did not see him about his knee injury but to provide him medical clearance for his transfer to another prison. Dkt. No. 54 at ¶45. He insists that her note related only to his medical clearance, not his knee injury. Id. at ¶46 (citing Dkt. No. 38-1 at 35).

From October 1 to 10, 2018, the HSU provided the plaintiff Naproxen twice a day for his pain. Dkt. No. 37 at ¶47. He received one dose of Naproxen on October 11, 2018, but then the medication was marked as unavailable. Id. at ¶48; Dkt. No. 38-5 at 6. On October 16, 2018, he submitted a request for health services stating he was in "extreme pain" and had "NO pain meds." Id. at ¶49; Dkt. No. 38-4 at 10 (emphasis in the original). The same day, the HSU ordered sixty additional Naproxen doses for the plaintiff. Dkt. No. 37 at ¶50; Dkt. No. 38-1 at 27. Nurse Kemerling responded to the plaintiff's request the next day (October 17, 2018), informing him that the medication "was put on the med cart." Dkt. No. 38-4 at 10. Kemerling did not see the plaintiff in the HSU this day. Dkt. No. 52 at ¶20. The plaintiff's medication was placed on the medication cart, and not given to him personally, because the plaintiff was on a "No KOP" restriction. Dkt. No. 44 at ¶31. That meant he could not keep

medication on his person or in his cell, and security staff would deliver his medication to him at designated times. Id.; Dkt. No. 45-1 at 73.

On October 18, 2018, the plaintiff submitted a request for health services stating that he was "experiencing [s]ignificant pain [and] stiffness in [his] L leg (knee area)." Dkt. No. 37 at ¶51; Dkt. No. 38-4 at 8. He noted that he had been wearing the immobilizer since his injury on September 8, 2018, and said he experienced "great pain" when he tried to bend his left knee. Dkt. No. 38-4 at 8. A nurse (not one of the State defendants) responded the next day that the plaintiff was "on providers schedule." Dkt. No 37 at ¶53; Dkt. No. 38-4 at 8. The same nurse saw the plaintiff in the HSU on October 18 and 19, 2018, but her progress notes from those appointments show that they were to address the plaintiff's arm soreness from a flu shot and stiffness in his neck. Dkt. No. 37 at ¶52; Dkt. No. 54 at ¶52; Dkt. No. 38-1 at 19.

On October 25, 2018, the plaintiff submitted a request for health services stating that he had "been wearing this knee immobilizer for almost 2 months [and] the pain in [his] L knee is becoming unbearable." Dkt. No. 44 at ¶32; Dkt. No. 38-4 at 6. The plaintiff asked to see a doctor and complained that he had not "been given any info on how to deal with this." Dkt. No. 38-4 at 6. Nurse Anderson received the plaintiff's request the next day. Dkt. No. 44 at ¶32. She reviewed the plaintiff's medical chart and records to confirm that the plaintiff's complaint was about an on-going issue and not a new injury. Id. at ¶33. Anderson reviewed the plaintiff's record showing that he had seen the doctor on September 24, 2018; had seen a nurse on October 18, 2018, albeit for his

arm pain; and had an upcoming appointment with an ACP to evaluate his knee. Id. at ¶34. His records showed that he was receiving medication for his pain and had medical restrictions for the immobilizer, crutches and to have meals in his cell. Id. Anderson therefore responded to the plaintiff's request by checking boxes noting his upcoming appointment in the HSU with an ACP. Id. at ¶35; Dkt. No. 38-4 at 6. Anderson admitted in response to the plaintiff's first request for admission that by checking those boxes, she meant that the plaintiff was scheduled to see Dr. Patterson. Dkt. No. 56 at 38. She did not see the plaintiff in the HSU that day. Dkt. No. 52 at ¶26.

On October 29, 2018, the plaintiff submitted a request for health services reiterating that he had been in the knee immobilizer since September 8, 2018, that he "repeatedly wrote in explaining the pain [he is] in [and he] still ha[s]n't seen the doctor." Dkt. No. 37 at ¶54; Dkt. No. 38-4 at 4. He complained that the "Naproxen is not serving the purpose to help with the pain" and asked "to see the Doctor ASAP." Dkt. No. 37 at ¶54; Dkt. No. 38-4 at 4. This request did not mention any nurse or request to see a nurse. Dkt. No. 60 at ¶26; Dkt. No. 38-4 at 4. Later that day, Dr. Patterson updated the plaintiff's prescriptions to include omeprazole, Naproxen, liquid Tylenol, albuterol, vitamin D and Singulair. Dkt. No 37 at ¶55. He also scheduled the plaintiff for visits with a physical therapist and asked the therapist to give the plaintiff a six-inch ace wrap for his left knee for the next two months. Id. at ¶56; Dkt. No. 38-1 at 24. The next day, a nurse (not one of the State defendants) responded that the plaintiff was "on the provider's schedule to be seen soon." Dkt. No. 38-4 at 4.

Also on October 30, 2018, the plaintiff wrote a letter directed to HSU Manager Waterman (not a defendant). Dkt. No. 37 at ¶57; Dkt. No. 38-1 at 36. The plaintiff summarized his injury, hospital visit and treatment. Dkt. No. 38-1 at 36. He noted that on September 24, 2018, he saw Dr. Patterson, who he said examined his knee and diagnosed "a possible ACL tear [and] meniscus damage [and] stated he would order an MRI." Id. The plaintiff expressed concern that the knee immobilizer could aggravate his degenerative joint disease. Id. He reported that he was in constant pain, that the Naproxen provided little relief and that his knee had become swollen in the immobilizer over the previous eight weeks. Id. He said that "even attempting to bend [his] L leg cause[d] [him] pain." Id. Later that same day, Patterson examined the plaintiff for the first time since September 24, 2018. Dkt. No. 37 at ¶58. His progress notes reveal "no signs of an obvious meniscal tear." Dkt. No. 38-1 at 20. Patterson advised the plaintiff "to remove the knee immobilizer[,] use an ace wrap as necessary and try walking normally." Dkt. No. 37 at ¶59; Dkt. No. 38-1 at 20. During another appointment with the plaintiff two days later, he advised the plaintiff not to participate in recreation until orthopedics had evaluated his knee. Dkt. No. 37 at ¶60; Dkt. No. 38-1 at 24.

The plaintiff asserts that from October 17 to 30, 2018, Nurses Drone and Kemerling, as well as two non-defendant nurses, told him in response to his requests for health services that they had placed him on the ACP's schedule to be seen. Dkt. No. 51 at ¶28. He says the ACP to whom those nurses referred "was meant to be Defendant James Patterson." Id. at ¶29. The nurses'

responses actually say that the plaintiff *was on* the provider's or ACP's schedule but do not say that *they placed him on* that schedule. Dkt. No. 56 at 4–6. Nurses Anderson and Drone did admit that when they told the plaintiff he was scheduled with the ACP, they meant he was scheduled with Dr. Patterson. Id. at 31, 38.

On November 13, 2018, the WSPF physical therapy department evaluated the plaintiff. Dkt. No. 37 at ¶61; Dkt. No. 38-1 at 32. The next day, the plaintiff underwent an MRI scan of his left knee. Dkt. No. 37 at ¶62; Dkt. No. 38-1 at 33. On December 14, 2018, Nurse Practitioner Milly Willenbring from the Gunderson Boscobel Area Hospital and Clinics (not a defendant) evaluated the plaintiff. Dkt. No. 37 at ¶63. She reviewed his injury history and noted that the plaintiff's MRI showed "degenerative changes about the patellofemoral joint, intact ACL graft with increased fluid in the tibial tunnel." Id. at ¶64; Dkt. No. 38-3 at 5. She further noted, "I do not believe that his primary pain or feeling of instability is due to his degenerative joint disease." Dkt. No. 37 at ¶65; Dkt. No. 38-3 at 5. The defendants assert that Willenbring "did not attribute the condition of [the plaintiff's] knee to the alleged delays in treatment." Dkt. No. 37 at ¶67. Willenbring's notes do not mention whether she was aware of any delay in the plaintiff's treatment, and she did not opine on whether she believed any delay could have contributed to his pain, swelling or stiffness.

## II.   Discussion

### A.   Summary Judgment Standard

A party is entitled to summary judgment if he or she shows that there is no genuine dispute as to any material fact and he or she is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." See Anderson, 477 U.S. at 248. A party's dispute of a proposed fact of which he or she has no personal knowledge does not create a genuine dispute of fact and does not preclude the court from granting summary judgment. See Payne v. Pauley, 337 F.3d 767, 772 (7th Cir. 2003) (citing Fed. R. Civ. P. 56(e) (now Rule 56(c)(4)) and Fed. R. Evid. 602). "Material facts" are those that "might affect the outcome of the suit." See Anderson, 477 U.S. at 248. Disputes about proposed facts "that are not outcome-determinative are not material and will not preclude summary judgment." Montgomery v. Am. Airlines, Inc., 626 F.3d 382, 389 (7th Cir. 2010).

Summary judgment is proper "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). To survive a motion for summary judgment, a non-moving party must show that sufficient evidence exists to allow a jury to return a verdict in its favor. Brummett v. Sinclair Broad. Grp., Inc., 414 F.3d 686, 692 (7th Cir. 2005).

B. Eighth Amendment Standard

The court reviews the plaintiff's claims under the Eighth Amendment, which "protects prisoners from . . . grossly inadequate medical care." Gabb v. Wexford Health Sources, Inc., 945 F.3d 1027, 1033 (7th Cir. 2019) (quoting Pyles v. Fahim, 771 F.3d 403, 408 (7th Cir. 2014)) (internal quotations omitted). Not "every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment." Estelle v. Gamble, 429 U.S. 97, 105 (1976). To prove that the defendants violated his rights under the Eighth Amendment, the plaintiff must present evidence establishing that he suffered from "'an objectively serious medical condition'" and that the defendants were "'deliberately, that is subjectively, indifferent'" to that condition. Whiting v. Wexford Health Sources, Inc., 839 F.3d 658, 662 (7th Cir. 2016) (quoting Duckworth v. Ahmad, 532 F.3d 675, 679 (7th Cir. 2008)). A prison official shows deliberate indifference when she "realizes that a substantial risk of serious harm to a prisoner exists, but then disregards that risk." Perez v. Fenoglio, 792 F.3d 768, 776 (7th Cir. 2015) (citing Farmer v. Brennan, 511 U.S. 825, 837 (1994)).

The plaintiff asserts that the defendants unnecessarily delayed treatment of his knee injury. "A delay in treating non-life-threatening but painful conditions may constitute deliberate indifference if the delay exacerbated the injury or unnecessarily prolonged an inmate's pain." Arnett v. Webster, 658 F.3d 742, 753 (7th Cir. 2011) (citing McGowan v. Hulick, 612 F.3d 636, 640 (7th Cir. 2010)). The length of delay that is tolerable "'depends on the

seriousness of the condition and the ease of providing treatment.'" Id. (quoting McGowan, 612 F.3d at 640). To prevail on an Eighth Amendment claim alleging a delay in providing treatment, the plaintiff "must also provide independent evidence that the delay exacerbated the injury or unnecessarily prolonged pain." Petties v. Carter, 836 F.3d 722, 730–31 (7th Cir. 2016). Such evidence may include a showing in the plaintiff's medical records that "the patient repeatedly complained of enduring pain with no modifications in care." Id. at 731; Williams v. Liefer, 491 F.3d 710, 715 (7th Cir. 2007).

The defendants do not dispute for purposes of this decision that the plaintiff's knee injury and resulting pain constitute a serious medical condition. Dkt. No. 36 at 11–12; Dkt. No. 43 at 4 n.6. The question is whether the evidence would allow a reasonable jury to conclude that each defendant showed deliberate indifference by delaying the plaintiff's treatment or knowingly disregarding his injury and complaints of pain.

C.  Dr. Patterson

The court allowed the plaintiff to proceed on a claim that the defendants "needlessly prolonged his pain" by delaying care of his knee pain for approximately forty-five days after his injury. Dkt. No. 17 at 7. The undisputed evidence shows that is not what occurred. Dr. Patterson saw the plaintiff twice between the date of his injury (September 8) and November 1, 2018—on September 24 and October 30, 2018. He also saw the plaintiff on November 1, 2018, although the parties spend little time discussing this visit. The plaintiff did not present any medical evidence showing that the short periods between

those appointments (sixteen days and just over a month, respectively) worsened his knee condition. Although the plaintiff complained of worsening pain over the two-month period, he does not point to any evidence suggesting that he would not have experienced that pain had Patterson examined him sooner or more frequently. Even if he had, the evidence shows that Patterson was not responsible for scheduling inmate appointments, so he would not have been the person to hold responsible for any delay between examinations.[2]

Dr. Patterson initially was scheduled to see the plaintiff on September 11 and 13, 2018, but those appointments had to be rescheduled because of other duties or time constraints. The evidence does not suggest that Patterson deliberately changed his schedule or refused to see the plaintiff for those appointments. The fact that he had to adjust his schedule to meet the prison's needs does not demonstrate that Patterson was deliberately indifferent to the plaintiff's medical condition. See Wilson v. Adams, 901 F.3d 816, 822 (7th Cir. 2018) (citing Petties, 836 F.3d at 730) (noting that "delays are common in prison" and "delays can also be reasonable" depending on the circumstances). The plaintiff was dissatisfied with how often he saw Patterson for medical appointments, but that dissatisfaction alone, without evidence that the delay was purposeful or that it exacerbated his injury, is not enough to defeat the motion for summary judgment. See id. (citing Knight v. Wiseman, 590 F.3d

---

[2] The plaintiff disputes Dr. Patterson's statement that he is not responsible for scheduling inmate appointments, but he cites no evidence in support of this dispute. Because there is no evidence that the plaintiff has personal knowledge about who schedules appoints, this dispute is not genuine and cannot defeat the defendants' motion. See Payne, 337 F.3d at 772.

458, 466 (7th Cir. 2009)); <u>Cesal v. Moats</u>, 851 F.3d 714, 724 (7th Cir. 2017)

(citing <u>Whiting</u>, 839 F.3d at 662–63).

The undisputed evidence shows that Dr. Patterson worked only part-time as a physician at WSPF through a contractual arrangement. He was not at the prison every day, did not work weekends and took several other days off for vacation or other commitments. The parties dispute whether Patterson was the plaintiff's primary physician between September and November 2018. <u>Compare</u> Dkt. No. 39 at ¶7, <u>with</u> Dkt. No. 52 at ¶34. But it is undisputed that the plaintiff could have seen (and did see) other ACPs or offsite doctors during that time. Dkt. No. 37 at ¶13; Dkt. No. 54 at ¶13. It also is undisputed that when Patterson was not at WSPF, prison staff did not update him on the condition of any patient. Dkt. No. 37 at ¶12; Dkt. No. 54 at ¶12. Under the totality of the circumstances, whether Patterson was the plaintiff's primary care provider at the time of these events is immaterial.

Dr. Patterson saw the plaintiff for his knee pain on September 24 and October 30, 2018, and modified his care on those dates and others. On September 11, 2018, Patterson approved the hospital's course of treatment and approved the plaintiff's request to eat meals in his cell. He was scheduled to see the plaintiff twice that week—on Tuesday, September 11 and Thursday, September 13, 2018—but he was unable to see the plaintiff because of time constraints and other duties at the prison. Although Patterson does not elaborate about these other commitments, the plaintiff has presented no

evidence disputing that they precluded Patterson from seeing the plaintiff for treatment.

Dr. Patterson did not work Friday, September 14 through Sunday, September 16, 2018. He returned to the prison on Monday, September 17, 2018, but he was not scheduled to see the plaintiff that day. It is not clear if he saw any patients that day. Even if he did, it is undisputed that Patterson was not responsible for scheduling inmate appointments, so he cannot be held liable for not seeing the plaintiff on September 17, 2018. Patterson then was out of the prison from Tuesday, September 18 through Sunday, September 23, 2018. It is undisputed that during that time, he did not see patients. Nor did HSU staff update or inform him about the status or condition of any patient, including the plaintiff and his complaints of pain. When Patterson returned to the prison on Monday, September 24, 2018, he had a scheduled appointment with the plaintiff. After this appointment, he discontinued the plaintiff's ibuprofen and started Naproxen 500—an anti-inflammation medication and pain reliever. He also referred the plaintiff for an appointment with orthopedics and an MRI (which a different, non-defendant staff member was responsible for scheduling) and extended the plaintiff's food-in-cell restriction for an additional two weeks.

The plaintiff did not see Dr. Patterson again until October 30, 2018. But he also did not file any requests for health services about his knee between September 24 and October 16, 2018. His October 16, 2018 request was about running out of Naproxen. Nurse Kemerling immediately ordered more, and the

medication was placed on the medication cart for the plaintiff. The plaintiff saw a non-defendant nurse twice in the next two weeks for issues other than his knee. The notes from those visits do not mention any complaints of knee pain or issues with the knee immobilizer. The plaintiff filed several requests for health services from October 16 through 29, 2018. But there is no evidence suggesting that Patterson was aware of the plaintiff's complaints of pain. One day before the plaintiff's October 30, 2018 appointment, Patterson again updated the plaintiff's prescriptions, requested a physical therapy referral and requested an ace wrap for the plaintiff. During the appointment, Patterson advised the plaintiff to remove the knee immobilizer, wrap the knee with the ace bandage and walk normally. The plaintiff later had an appointment with physical therapy and underwent an MRI of his knee at the hospital.

These undisputed facts show that during the relevant period, Dr. Patterson did not blindly follow the same course of treatment. He modified the plaintiff's medications on at least two occasions after having an appointment with the plaintiff and learning about his continued pain. He approved other requests for treatment on various days between the appointments, including days after the plaintiff returned from the hospital and in anticipation of the October 30, 2018 appointment. Patterson also scheduled the plaintiff for other treatments he could not provide, including physical therapy and an MRI.

The plaintiff asserts that he told Dr. Patterson during the September 24, 2018 appointment that the knee immobilizer was causing him pain. The plaintiff's medical records from September 24, 2018 do not reflect this

complaint, and the defendants dispute that the plaintiff brought it up. This dispute is immaterial. "Disagreement between a prisoner and his doctor, or even between two medical professionals, about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation." Pyles, 771 F.3d at 409 (citing Johnson v. Doughty, 433 F.3d 1001, 1013 (7th Cir. 2006)). But neither may prison officials "doggedly persist[] in a course of treatment known to be ineffective." Greeno v. Daley, 414 F.3d 645, 655 (7th Cir. 2005). In other words, the plaintiff must show the treatment he received was "'so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate' his condition." Id. at 654 (quoting Snipes v. DeTella, 95 F.3d 586, 592 (7th Cir. 1996)).

Even assuming the plaintiff told Dr. Patterson during the September 24, 2018 appointment that the knee immobilizer was causing him pain and Patterson did not remove the immobilizer, the plaintiff has not identified evidence suggesting that decision was a "significant . . . departure from accepted professional standards or practices." Pyles, 771 F.3d at 409. That the plaintiff's pain returned or worsened after the September 24, 2018 appointment does not mean that Patterson's decision was blatantly inappropriate. Even the best medical treatment may not prevent all pain or discomfort. See Franklin v. Bowens, 777 F. App'x 168, 169 (7th Cir. 2019) (quoting Snipes, 95 F.3d at 592) ("The Eighth Amendment does not require prison doctors 'to keep an inmate pain-free in the aftermath of proper medical treatment.'"). At most, evidence that Patterson decided not to remove the knee

immobilizer despite the plaintiff's complaints might allow a jury to conclude that Patterson committed medical malpractice. But medical malpractice does not constitute deliberate indifference and does not violate the Eighth Amendment. Berry v. Peterman, 604 F.3d 435, 441 (7th Cir. 2010) (citing Estelle, 429 U.S. at 106). As explained above, the evidence shows that Patterson did not persist in continuing an ineffective course of treatment but instead altered the plaintiff's treatment in response to his complaints during their appointments.

To proceed on his claim that Dr. Patterson needlessly delayed treatment of his knee injury, the plaintiff needed to provide verifying medical evidence that his condition worsened because of the delay in treatment. He did not provide any such evidence. The plaintiff alternatively needed to show that Patterson was aware of the plaintiff's continued, worsening pain but took no action to alleviate it or that the action he took was blatantly inappropriate. The undisputed evidence would not allow a reasonable jury to draw that conclusion. The court will grant Patterson's motion for summary judgment.

D.    State Defendants

The court allowed the plaintiff to proceed on a claim that the State defendants "knew he was in 'extreme' and 'unbearable' pain, but instead of addressing that pain or examining the plaintiff and providing treatment to sustain him while waiting for his appointment with the advance care provider, simply told him that he was scheduled with an advance care provider." Dkt. No. 17 at 7–8. That Eighth Amendment claim can survive summary judgment

only if the plaintiff provided evidence in support of it. See Wilson, 901 F.3d at 822; Knight, 590 F.3d at 466. But as with his claim against Dr. Patterson, the plaintiff has failed to identify medical evidence showing that the wait between appointments worsened his knee injury or unnecessarily prolonged his pain.

The evidence shows that on several occasions, the State defendants did respond to the plaintiff's requests for treatment by telling him he was scheduled to see an ACP soon. See Dkt. No. 38-4 at 6, 8, 12–13. The plaintiff suggests there was other action the nurses could have taken, such as scheduling him for a sick call visit. Dkt. No. 50 at 19. But the State defendants explained that they had reviewed the plaintiff's file and confirmed that he had medication, which they could provide only if prescribed and could not alter on their own. They also confirmed that the plaintiff was scheduled to see an ACP, who *could* alter or prescribe medication. On September 18 and 22, 2018, Nurse Drone told the plaintiff that he was "scheduled with the ACP soon." Dkt. No. 38-4 at 12–13. At the time, the plaintiff was scheduled to see Dr. Patterson on September 24, 2018—the first day Patterson would be back at the prison after being out from September 18 through 23. On October 26, 2018, Nurse Anderson checked boxes showing that the plaintiff was scheduled with an ACP. Id. at 6. The plaintiff was scheduled with Patterson on October 30, 2018—four days later.[3] Drone and Anderson's statements were therefore accurate.

_____

[3] On October 19, 2018, a non-defendant nurse told the plaintiff that he was on a provider's schedule. Id. at 8. It is not clear whether the plaintiff was on Patterson's schedule or, if so, whether he was scheduled to be seen earlier than October 30, 2018. Because the nurse is not a party to this lawsuit, the court

It is undisputed that the plaintiff's medical concern was non-life-threatening, and he had pain medication available leading up to his appointment with Dr. Patterson. Nurses Drone and Anderson knew that the plaintiff's condition "was a chronic ailment and not a new injury," that he had the same medication they were authorized to provide him and that he had an upcoming appointment with an ACP. Dkt. No. 46 at ¶11; Dkt. No. 47 at ¶14. Drone avers that under those circumstances, there was nothing more they as nurses could provide the plaintiff before his upcoming appointment. Dkt. No. 46 at ¶12. The plaintiff has not identified any evidence to contradict that statement. Because there was nothing more a sick call visit could accomplish, it was not unreasonable for the State defendants not to arrange for such a visit. The evidence would not allow a reasonable jury to conclude that it was unreasonable for Drone and Anderson to respond to the plaintiff's requests for treatment by reminding him of his appointment with Patterson rather than scheduling a visit with him. See Wilson, 901 F.3d at 822; Petties, 836 F.3d at 730.

The plaintiff asserts that his complaints were ignored and that he was "without any medical treatment" from September 17 to 23 and September 25 through October 29, 2018—the days between his appointments with Dr. Patterson. Dkt. No. 52 at ¶35. But the evidence does not support that claim. The plaintiff's medical records show that he had appointments with nurses on

_____

need not determine whether her response to the plaintiff's request was reasonable.

October 4, 18 and 19, 2018, but that he did not bring up his knee issues. Dkt. No. 38-1 at 19. When the plaintiff ran out of medication on October 16, 2018, Nurse Kemerling ordered a refill and had the medication placed on the medication cart for the plaintiff. Dkt. No. 38-4 at 10–11. The nurses routinely reviewed and responded to the plaintiff's requests for health services, whether about his knee issues or other concerns. Id. at 5–10, 12–13. The fact that the plaintiff did not have a doctor's appointment between those dates does not mean he was without medical treatment or was being ignored.

The evidence does not support a claim that the State defendants were otherwise deliberately indifferent to the plaintiff's knee injury or pain. The State defendants aver, and the plaintiff does not dispute, that they deferred to the judgment of the ACPs regarding treatment decisions. The Seventh Circuit has held that, "[a]s a matter of professional conduct, nurses may defer to instructions given by physicians unless 'it is apparent that the physician's order will likely harm the patient.'" Holloway v. Delaware Cty. Sheriff, 700 F.3d 1063, 1075 (7th Cir. 2012) (quoting Berry, 604 F.3d at 443). The nurses could be held deliberately indifferent to a risk of harm in following the ACP's orders only if the risk to the plaintiff's health was "obvious." Rice ex rel. Rice v. Corr. Med. Servs., 675 F.3d 650, 683 (7th Cir. 2012). The plaintiff has identified no evidence suggesting that Dr. Patterson's orders put him at an obvious risk of harm. He appears to have disagreed with his course of treatment but as noted, that is not enough to satisfy the Eighth Amendment. See Pyles, 771 F.3d at 409; Johnson, 433 F.3d at 1013. The evidence does not support a finding that

the State defendants violated the plaintiff's Eighth Amendment rights by deferring to Patterson's medical judgment and following his treatment orders and decisions.

Nor can the State defendants be held liable for not providing treatment, prescribing medication or performing other acts that were beyond their authority to provide. See Burks v. Raemisch, 555 F.3d 592, 595 (7th Cir. 2009) (noting that "no prisoner is entitled to insist that one employee do another's job"). The undisputed facts show that the State defendants, as nurses, had limited authority over the plaintiff's treatment. They could not prescribe medication. They could not override an ACP's treatment decisions. They could not schedule the plaintiff for an offsite consultation or recommendation. They *could* provide various over-the-counter medications and treatments. They could refer the plaintiff for placement on an ACP's schedule but could not control the ACP's schedule or dictate when the doctor would see the plaintiff. The evidence shows the nurses did not exceed their authority and provided the plaintiff the treatment they were authorized to provide during the relevant period.

Under the Eighth Amendment, an incarcerated person "is not entitled to demand specific care . . . [or] the best care possible. [H]e is entitled to reasonable measures to meet a substantial risk of serious harm to h[im]." Forbes v Edgar, 112 F.3d 262, 267 (7th Cir. 1997). The evidence shows the plaintiff received continuous, reasonable care for his knee injury between September 8 and November 1, 2018. The State defendants tended to the plaintiff's concerns and treated him to the extent of their authority and ability

as nurses. He may not have received what he believed was the best care possible, and he is not satisfied with the care he received. But that does not mean that the State defendants were deliberately indifferent to his pain or his injury. Because a reasonable jury would not conclude otherwise, the State defendants are entitled to judgment as a matter of law.[4]

### III. Conclusion

The court **DENIES** the plaintiff's request for an entry of a direct verdict in his favor. Dkt. No. 30.

The court **DENIES AS MOOT** the plaintiff's motion to appoint counsel. Dkt. No. 68.

The court **GRANTS** defendant Patterson's motion for summary judgment. Dkt. No. 35.

The court **GRANTS** the State defendants' motion for summary judgment. Dkt. No. 42.

The court **DISMISSES** this case. The clerk will enter judgment accordingly.

This order and the judgment to follow are final. A dissatisfied party may appeal this court's decision to the Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within **30 days** of the entry of judgment.

---

[4] Because the court is granting summary judgment to the defendants on the merits, it need not analyze their claims of qualified immunity. See Sierra-Lopez v. County, No. 17-CV-1222-PP, 2019 WL 3501540, at *10 (E.D. Wis. July 31, 2019) (citing Viero v. Bufano, 925 F. Supp. 1374, 1387 (N.D. Ill. 1996); and Antepenko v. Domrois, No. 17-CV-1211, 2018 WL 6065347, at *6 (E.D. Wis. Nov. 20, 2018)).

<u>See</u> Federal Rule of Appellate Procedure 3, 4. This court may extend that deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. <u>See</u> Federal Rule of Appellate Procedure 4(a)(5)(A).

Under certain circumstances, a party may ask this court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within **28 days** of the entry of judgment. The court cannot extend this deadline. <u>See</u> Federal Rule of Civil Procedure 6(b)(2). Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. The court cannot extend this deadline. <u>See</u> Federal Rule of Civil Procedure 6(b)(2).

The court expects parties to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.

Dated in Milwaukee, Wisconsin this 8th day of August, 2022.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**United States District Judge**